# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 14, 2007          Decided July 6, 2007

No. 06-5016

CYNTHIA J. VICKERS,
APPELLANT

v.

DONALD E. POWELL, CHAIRMAN, FEDERAL DEPOSIT
INSURANCE CORPORATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 03cv00174)

*Richard L. Swick* argued the cause for appellant. With him on the briefs were *David H. Shapiro* and *Ellen K. Renaud*.

*Marian L. Borum*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Michael J. Ryan*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS, TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Appellant Cynthia Vickers claims that the Federal Deposit Insurance Corporation ("FDIC") wrongfully terminated her employment. We review the district court's grant of summary judgment against Vickers on all her claims and affirm its decision that she was not the victim of illegal retaliation and discrimination, but vacate the decision granting summary judgment for the FDIC on her hostile work environment claim. We also reverse its decision that the Merit Systems Protection Board ("MSPB" or "Board") was not arbitrary and capricious when it failed to explain why Vickers' refusal to sign a medical release form that did not protect her privacy interest was a firing offense.

## I.

### A.   Background

Cynthia Vickers is an African-American woman who worked as a federal law enforcement officer since 1984 and as a criminal investigator in the Atlanta office of the FDIC from 1991 until her dismissal in 2001. By all accounts, Vickers had a strained relationship with her direct supervisor at the FDIC, Dana Bedwell, the Special Agent in Charge ("SAC") of the Atlanta office. On October 31, 2000, there was an unpleasant workplace exchange between the two. Vickers told Bedwell that she would be out of the office for most of the next week conducting investigations and would miss the full week after that for medical treatment. Already concerned about the way Vickers was spending her time, Bedwell asked her how many interviews each upcoming investigation would require. Vickers could not tell him on the spot and, in frustration, accused Bedwell of micromanaging her work. The discussion became heated, and both Bedwell and Vickers raised their voices. Vickers stormed out of the office, saying "I don't need this" and

"I'm out of here." On the way out, she gave a secretary her government identification and cellular phone. The next day, Vickers' husband came to the office and turned in her government credit card, office keys, and a laptop computer. The following day, November 2, 2000, Bedwell sent Vickers a letter that gave his account of the argument and granted her four hours of administrative leave for the time she left work that day. The letter also put Vickers on notice that she was absent without authorized leave and warned her that if she did not return to work by November 6, 2000, Bedwell would begin termination proceedings against her. Vickers returned to the office on November 6, not to work, but to hand Bedwell a letter requesting six months leave without pay to resolve the "mental, emotional, and physical anguish" caused by her employment at the FDIC. The FDIC granted her request. Sometime in November, Vickers spoke with an Equal Employment Opportunity ("EEO") counselor at the FDIC and even filed a complaint with the Equal Employment Opportunity Commission alleging various discriminatory acts against her. The record tells us nothing about her conversation with the counselor, the content of her complaint, or its disposition.

For the next five months, Vickers was treated for severe depression. On March 20, 2001, she gave the FDIC a letter from her psychiatrist stating that she would be able to return to work on May 1, 2001. In a letter dated March 23, 2001, Bedwell notified Vickers that before she could be allowed to return to work after an illness, she was required pursuant to 5 C.F.R. § 339.301[1] to successfully complete a medical examination at

---

[1] The regulation provides that:

(b) Subject to § 339.103 of this part, an agency may require an individual who has applied for or occupies a position which has medical standards or physical

the U.S. Public Health Services ("PHS") on April 9 and 10, 2001. Vickers did not contest this requirement and submitted to the examination, but, acting on the advice of counsel, refused to sign either of the two forms that authorized the release of her medical information because, according to Vickers, they lacked sufficient safeguards to protect her privacy, especially in light of office rumors about her previous medical treatments. One of the forms, the Release Form, was a general medical release that authorized the recipient to release medical information to whomever was listed on the form. The second release, the Exam Form, was to be completed as part of Vickers' medical examination and authorized the recipient to release information pertinent to the exam. On April 18, 2001, acting-SAC Thomas McDade, who had replaced Bedwell after his March 2001 retirement, sent Vickers a letter demanding that she return to the PHS to complete the required paperwork. The letter warned that failure to do so would "be grounds for disciplinary action up to

---

requirements or which is part of an established medical evaluation program, to report for a medical examination:

(1) Prior to appointment or selection (including reemployment on the basis of full or partial recovery from a medical condition);

(2) On a regularly recurring, periodic basis after appointment; or

(3) Whenever there is a direct question about an employee's continued capacity to meet the physical or medical requirements of a position.

5 C.F.R. § 339.301(b).

and including removal." Vickers again refused to sign either form.

Assistant Inspector General for Investigations ("AIGI") Samuel Holland, who was "designated the agency official authorized to make the final decision in this matter," made the decision to fire Vickers effective December 14, 2001, and gave four reasons for doing so: (1) she showed disrespect to Bedwell during their October 31, 2001 meeting; (2) she failed to provide the information regarding her work that Bedwell requested in that meeting; (3) she failed to sign the releases, which were a necessary part of the required medical examination; and (4) she failed to follow McDade's instructions to return to the PHS to sign the releases. Letter from Samuel Holland, Assistant Inspector General for Investigations, FDIC, to Cynthia Vickers (Dec. 6, 2001).

## B.    Prior Proceedings

We have commented before on the "extremely complicated" interplay between the two statutory schemes that govern the process by which a civil servant may challenge an adverse employment action when she claims that she was not only treated unfairly but in violation of her civil rights. *See Butler v. West*, 164 F.3d 634, 638-39 (D.C. Cir. 1999). This case illustrates the point. The Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in sections of 5 U.S.C.), grants civil servants like Vickers a statutory right to appeal adverse employment actions to the Merit Systems Protection Board. Before the Board, the employer must demonstrate that its reasons for firing the civil servant are supported by a preponderance of the evidence, *see* 5 U.S.C. § 7701(c)(1)(B), and that the penalty imposed was reasonable, *see Douglas v. Veterans Admin.*, 5 M.S.P.B. 313 (1981). The employee must prove any affirmative defenses by

a preponderance of the evidence. *See* 5 C.F.R. § 1201.56(a)(2)(iii). Vickers appealed her discharge to the Board in January 2002. She denied any wrongdoing and countered the FDIC's accusations with affirmative defenses that her termination was the result of unlawful sexual and racial discrimination and retaliation for having engaged in EEO activities. An administrative law judge ("ALJ") took evidence, heard arguments, and upheld the FDIC's firing of Vickers. *See Vickers v. FDIC*, No. AT-0752-02-0233-I-2 (M.S.P.B. Dec. 9, 2002) ("MSPB Decision"). The ALJ found that Vickers failed to follow Bedwell's instructions to update him on her cases and the later instruction from McDade to sign the medical releases, *id.* at 12-13, but rejected the FDIC's charge that Vickers was disrespectful to Bedwell. Because Bedwell had raised his voice during the argument, the ALJ found "that her responses and leaving the meeting were not acts of disrespect, but rather a spur-of-the-moment, emotional reaction to [Bedwell's] failure to maintain his own professionalism." *Id.* at 4.

Significantly for our analysis, the ALJ did not fault Vickers for her refusal to sign one of the medical release forms—the Release Form—because it "was blank as to the name of the doctors/clinics [to whom] these forms would be sent and to whom the information would be released," *id.* at 7, and "Holland testified that he would not order an employee to sign a form that did not say to whom the information would be released," *id.* at 10. The ALJ did fault Vickers, however, for her refusal to sign the other medical release form—the Exam Form—because in the ALJ's view it expressly limited the PHS to making inquiries about Vickers medical history of "doctors, hospitals, or clinics she mentioned in answering the questions on the form" and it provided that any medical information collected could only be released "to the agency's designated point of contact on a need-to-know basis." *Id.* at 10. The ALJ was further swayed by the fact that Vickers "had previously signed

the [same] release on the Exam Form on January 21, 2000." *Id.*[2]

The ALJ rejected Vickers' affirmative defenses that she was fired because of her race and gender and in retaliation for her EEO activities. As to her discrimination defense, the ALJ held that Vickers "presented no direct evidence that reflects directly the discriminatory attitude *and* bears directly on her removal." *Id.* at 13 (emphasis in original). The ALJ rejected Vickers' retaliation defense because she had not provided sufficient evidence demonstrating that her firing was done in retaliation for her EEO activities. *Id.* at 22.

Although Board decisions are generally reviewed by the Court of Appeals for the Federal Circuit, *see* 5 U.S.C. § 7703(b)(1), "mixed cases" that involve both MSPB appeals and discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, are reviewed in federal district court, *see* 5 U.S.C. § 7703(b)(2), which is where Vickers brought her claims. Vickers alleged that the MSPB's decision "was arbitrary, capricious, contrary to government law and regulation, and not supported by substantial evidence." Am. Compl. ¶ 20(d). She also alleged that the FDIC committed three Title VII violations: (1) retaliation for protected EEO activities; (2) discrimination; and (3) creating a hostile work environment.

The district court granted the FDIC's motion for summary judgment against Vickers on all of her claims. *Vickers v. Powell*, Civ. No. 03-174, 2005 WL 3207775 (D.D.C. Nov. 21, 2005). The court determined that the MSPB decision was

---

[2] Neither the ALJ's reference to this earlier signing of the Exam Form nor any other part of the record reveals the circumstances surrounding this prior physical examination.

neither arbitrary nor capricious and was supported by substantial evidence. *Id.* at \*15-25. The district court also rejected Vickers' Title VII claims. As to her retaliation claim, the district court determined that Vickers "failed to meet her burden of showing that a reasonable jury could conclude that she was terminated due to retaliation" because she did not provide sufficient evidence demonstrating that the FDIC's legitimate, non-discriminatory justification for her firing was pretext. *Id.* at \*28 (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc)). Although the district court failed to expressly address Vickers' discrimination claim, its review of her MSPB appeal included a rejection of her allegation raised as an affirmative defense before the ALJ that she was unlawfully fired because of her race and gender. The district court found after a *de novo* review that Vickers failed to "produce evidence showing the described [discriminatory] events bore directly on her termination." *Id.* at \*27. The district court also rejected Vickers' hostile work environment claim because it found that most of Vickers' allegations were untimely and the few timely incidents were insufficient to support a hostile work environment claim. *Id.* at \*32-35. Having lost each of her claims, Vickers now appeals that decision to this Court.

## II.

Like her claims in the district court, Vickers' appeal presents two legally-distinct but factually-related issues. First, we must decide whether the MSPB's decision affirming Vickers' firing was arbitrary, capricious, an abuse of discretion, or unsupported by substantial record evidence. 5 U.S.C. § 7703(c). We do not, however, defer to the district court. *See Fogg v. Ashcroft*, 254 F.3d 103, 112 (D.C. Cir. 2001) (noting that district court assessment "drops out of the multiple layers of deference"); *Novicki v. Cook*, 946 F.2d 938, 941 (D.C. Cir. 1991) ("We do not defer to a district court's review of an agency

adjudication any more than the Supreme Court defers to a court of appeals' review of such a decision."). Next, we review the district court's grant of summary judgment against Vickers' Title VII claims. We conduct that review *de novo*. *See, e.g.*, *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). We "view the evidence in the light most favorable to [Vickers], draw all reasonable inferences in her favor, and eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).

## A. The MSPB Decision

Vickers challenges two aspects of the MSPB's decision: whether the determination affirming her firing was arbitrary, capricious, or unsupported by substantial evidence and whether that penalty was an appropriate sanction and consistent with the MSPB's precedent. Because we conclude that the Board's affirmation of the FDIC decision to fire Vickers was arbitrary and capricious, we need not reach her challenge to the penalty. The Board failed to explain why Vickers was within her rights to refuse to sign the Release Form because it did not disclose where her medical records might be sent, but wrong to refuse to sign the Exam Form, which had the same flaw.

The MSPB rejected the FDIC's charge that Vickers wrongly refused to sign the Release Form because the Board found it "was blank as to the name of the doctors/clinics [that] these forms would be sent and to whom the information would be released." MSPB Decision at 7. The relevant portion of the Release Form provides, "[Recipients of the Release] are hereby authorized to furnish information from the record of the individual named below [Vickers] which is in the record of your facility, and release it to: [BLANK BOX]." The MSPB reasonably concluded that Vickers was justified in her refusal

to sign such an open-ended grant of permission to release confidential medical information. But the Exam Form that the Board faulted Vickers for not signing offered her no more protection:

> I [Vickers] certify that I have reviewed the foregoing information supplied by me and that it is true and complete to the best of my knowledge. I authorize any of the doctors, hospitals, or clinics mentioned on these forms to furnish the Government a complete transcript of my medical record for purposes of processing this exam. I authorize the release of all medical information to the Federal Occupational Health/Law Enforcement Medical Program and on a need to know basis, the designed [sic] (Agency/Name) point of contact.

*Id.* at 6-7 (citation omitted). We see no significant distinction between the privacy protections in each form that would justify the Board concluding that Vickers was free to refuse to sign one but committed a firing offense for refusing to sign the other. Like the Release Form, the Exam Form was blank as to whom the information would be released, and Holland, who ultimately made the decision to fire Vickers, reasonably testified that "he would not order an employee to sign a form that did not say to whom the information would be released." *Id.* at 10. The Exam Form noted only that Vickers' medical records could be released to "(Agency/Name) point of contact." The generic term "Agency/Name" does not provide adequate protection for Vickers' confidential medical records. To protect her privacy, it should have specified the particular agency or point of

contact.[3] The MSPB thought the form provided sufficient protection because it "identified to which providers request for documents would be sent and to whom the responsive documents would be provided." *Id.* at 10. That does not describe the Exam Form, which failed to specify *what agency* or *which point of contact* would have access to Vickers' confidential medical records. Because the MSPB found that a similar failing in the Release Form justified Vickers' refusal to sign, it should have come to the same conclusion for her refusal to sign the also-flawed Exam Form. That it did not was an

---

[3] The record contains some suggestion that the Exam Form Vickers refused to sign actually designated the FDIC-OIG (Office of Inspector General) as the entity to which her medical information would be released. Such a designation would have been a sufficient safeguard for her privacy. But the copy of the Exam Form submitted to the Court and the MSPB is illegible, and the language quoted by the MSPB (and cited by the district court) was not from the actual form Vickers refused to sign. It was from a copy of the form in which none of the blanks had been filled in. *See* MSPB Decision at 7 n.5 (noting that the Exam Form language came from "a blank copy of the Exam Form . . . on which [Vickers] refused to complete the medical release," and that the blank form was submitted because the form Vickers refused to sign was "not legible"). Vickers' attorney submitted a letter to the FDIC that indicated the form Vickers refused to sign was complete and did not have the blanks that so trouble us. *See* Letter from Joleen Payeur Olsen, Attorney to Cynthia Vickers, to Janet Welch, Employment Relations Specialist, FDIC, at 2 (April 27, 2001) (quoting from Exam Form that information would be released "on a need to know basis, the *designated FDIC-OIG point of contact*") (emphasis added). When questioned at oral argument, however, the government maintained that the Exam Form Vickers refused to sign had not designated to whom the information would be released beyond "(Agency/Name) point of contact." The government dismissed as "mistaken" the concession offered by Vickers' counsel in her April 2001 letter. Recording of Oral Argument at 23:30.

arbitrary and capricious decision that the district court should not have affirmed.

The MSPB further erred by finding that Vickers' earlier signing of another medical release left her without an excuse for refusing to sign the Exam Form. *See* MSPB Decision at 10 (finding Vickers' objection to signing the Exam Form "particularly troubling because, without incident, she previously signed the release on the Exam Form on January 21, 2000"). The earlier form provided that information collected could only be released to the FDIC Office of Inspector General point of contact. That limitation is simply not part of the form Vickers justifiably refused to sign in April 2001. The Board's failure to acknowledge the obvious difference between the two release forms was arbitrary and capricious. Because we fault the Board for requiring Vickers to sign the Exam Form, we need not reach the FDIC's other charges. We remand this matter to the district court with instructions to further remand the matter to the MSPB to determine whether the remaining allegations constitute an independent basis for Vickers' firing.

## B. Title VII Claims

Vickers also appeals the district court's decision to grant summary judgment for the FDIC on her Title VII claims. Title VII prohibits federal agencies from workplace "discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). The familiar *McDonnell Douglas* framework governs its application for discrimination and retaliation claims. *See, e.g.*, *Chappell-Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006) (noting that "the Supreme Court set out a burden-shifting approach [in *McDonnell Douglas*] to employment discrimination claims in cases where the plaintiff lacks direct evidence of discrimination"); *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984) ("The

*McDonnell Douglas* framework is also applicable to claims of retaliatory dismissal.").  The successful plaintiff in a Title VII case must first establish a "prima facie case of racial discrimination," *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), by showing that, "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Chappell-Johnson*, 440 F.3d at 488 (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).  The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802.  In reply, the plaintiff must show that the employer's proffered justification is mere pretext and thus a "coverup for a racially discriminatory decision." *Id.* at 805.

After the employer offers a non-discriminatory justification for its actions, the *McDonnell Douglas* framework falls away, and  we must determine whether a reasonable jury could "could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff." *Aka*, 156 F.3d at 1289 (reviewing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-11 (1993)). In this case, both Vickers' retaliation and discrimination claims fail because of the relative weakness of her prima facie cases and because she has not shown that the FDIC's justification for her firing—her failure to follow instructions and complete a medical examination—was mere pretext for discrimination.

## 1.     Retaliation Claim

We begin with Vickers' claim that the FDIC fired her in retaliation for her complaints of sex- and race-based discrimination.  *See* 42 U.S.C. § 2000e-3.  To make out a prima

facie case of illegal retaliation, Vickers must show that "(1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection exists between the two." *Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998). Vickers alleges her discharge was in retaliation for two complaints she made to FDIC officials about the alleged discrimination she experienced. The first was a conversation she had with Holland on September 29, 2000, in which she allegedly complained of the office's sexist and racist environment. Holland acknowledged that the conversation took place, but denied that Vickers raised any concerns about discrimination. Vickers also contacted an EEO counselor in November 2000 and filed an EEO complaint shortly thereafter. As we noted above, the record tells only that the contact occurred and that the complaint was filed. We know nothing of the content of either or the disposition of the complaint. Like the district court, we assume *arguendo* that Vickers alleged a prima facie case of retaliation and that the burden shifted to the FDIC to articulate a legitimate, non-discriminatory reason for her termination, which it did. According to the FDIC, Vickers "failed to complete her medical examination; failed to sign the necessary release forms, preventing an independent evaluation of whether [she] was fit to [sic] duty; and failed to follow the [FDIC's] orders." *Vickers*, 2005 WL 3207775, at *28.

In challenging the district court's decision that she had not provided sufficient evidence demonstrating that the FDIC's proffered justification was pretext, Vickers argues that the court ignored "factors that raise an inference of retaliatory motive by Holland." Appellant's Br. at 29. She asserts that the fact that Holland claims they did not speak of discrimination during their September 2000 conversation and was allegedly annoyed by her complaints permits "a reasonable juror [to] infer that Holland lied about his conversation to hide his retaliatory motive." *Id.* at 30. Vickers also asserts that Holland's decision to impose the

highest possible penalty, termination, could also be reasonably seen as retaliation. *Id.* at 31. We are not persuaded. Although Vickers baldly asserts that Holland might be lying to hide his retaliatory motive, she failed to provide any evidence indicating why Holland, who ultimately made the decision to terminate Vickers, might have wanted to see her removed. He was not involved in any of the events that preceded Vickers' termination, nor did he participate in any of the alleged incidents that make up Vickers' hostile work environment claim. Instead, as Assistant Inspector General for Investigations, Holland had been given the authority to review the allegations against Vickers and make the ultimate decision to keep her or fire her. Without more than what Vickers has offered as evidence, we cannot see how a reasonable jury might find a retaliatory motive at work in Holland's decision. Vickers' retaliation claim is further undermined by the fact that even though it was Holland who fired her, Bedwell was the focus of her discrimination claims. Vickers failed to put on any evidence to show that Holland's decision was in any way influenced by Bedwell, who had retired before Vickers' refusal to sign the releases in April 2001 that triggered her firing. *See, e.g.*, *Griffin v. Wash. Convention Ctr.*, 142 F.3d 1308, 1311-12 (D.C. Cir. 1998) (holding that subordinate's bias is only relevant "where the ultimate decision maker is not insulated from the subordinate's influence").

Nor can Vickers' Title VII claims draw support from our decision to remand the MSPB decision for further review of the limited issue why Vickers was fired for refusal to sign the Exam Form. That we have raised the question that the FDIC *may* have unfairly fired Vickers does not suggest that the decision to do so was based on race or gender discrimination. There is simply no persuasive evidence that Vickers was the victim of such unlawful bias, and she has failed to show that her firing for her refusal to sign the Exam Form was somehow an attempt to cover for prohibited behavior. The mere possibility of an allegation of

a violation of Title VII without supporting evidence does not create a presumption of illegality against Vickers' firing. She must make a showing in support of her discrimination claims. We have previously recognized that there is a distinction between discrimination claims that are wanting, as here, and the fact that a termination may not have been fair. *See Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001) ("Consistent with the courts' reluctance to become involved in the micromanagement of everyday employment decisions, the question before the court is limited to whether [the plaintiff] produced sufficient evidence of . . . discrimination, not whether he was treated fairly . . . .") (citations omitted); *cf. Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999) ("If the plaintiff explodes the phony reason with evidence that simply supports an unsavory but lawful alternative reason . . . , the plaintiff cannot get to the jury."). Our decision to grant the petition for review of the MSPB proceeding therefore does not affect the Title VII analysis.

Having thus looked to the categories of evidence highlighted by *Aka*, we conclude that a reasonable jury could not infer discrimination from Vickers' allegations. Vickers' prima facie case is relatively weak because it is not clear that there exists a causal connection between her EEO activities and Holland's decision to fire her. She has also failed to rebut the FDIC's legitimate, non-discriminatory justification for her firing with any evidence to support her allegations of unlawful discrimination. Vickers never argued that the various discriminatory acts alleged in her hostile work environment claim discussed below were further evidence of pretext. The district court therefore correctly determined that Vickers "failed to meet her burden of providing sufficient evidence for a reasonable jury to conclude that she was terminated due to retaliation." *Vickers*, 2005 WL 3207775, at *29.

**2.      Discrimination Claim**

Vickers' discrimination claim is based on alleged "repeated harassment and criticism of [her] conduct," up to and including her removal, "that was not based on a fair appraisal of her performance and conduct, but rather was the result of unlawful discrimination based upon her race and sex." Am. Compl. ¶ 19(b). In making out her prima facie case of discrimination, Vickers has alleged that she was the victim of two adverse employment actions: unfair performance appraisals and termination. But Vickers has shown no evidence that she received a low performance appraisal. In fact, the only record evidence shows that Vickers received the second highest performance evaluation in the office in October 2000 and received a $1,500 performance award for her performance in 1999-2000. *Vickers*, 2005 WL 3207775, at *10 (citing Def.'s Stmt. of Mat. Facts ¶ 5; Pl.'s Response to Def.'s Stmt. ¶ 5). A reasonable jury could not conclude that her performance appraisal was tainted by discrimination. As to her firing, even if we assume *arguendo* that Vickers has established a prima facie case of discrimination, her claim fails for the same reason her retaliation claim failed. As we set forth above, she has established a weak prima facie case at best and provided insufficient evidence to demonstrate that the FDIC's proffered justification for her removal was pretext for discrimination.

**3.      Hostile Workplace Claim**

Vickers' final Title VII claim is that she was subjected to a hostile work environment at the FDIC because of her sex and race. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*,

18

510 U.S. 17, 21 (1993) (quotation marks and citations omitted). To determine whether a work environment is hostile, we look "'at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23). In this case, Vickers alleges thirteen incidents that make out her hostile work environment claim:

1. In 1992 she "was ridiculed by her supervisor [Mike Mitchell] because she attended the Women in Federal Law Enforcement Conference ("WIFLE") in Washington, D.C." *Vickers*, 2005 WL 3207775, at *9.

2. She "was subject to unwanted and continuing conversations about her [supervisor Mitchell's] divorce and sexual dysfunction" around 1993-1994. *Id.*

3. In 1995 or early 1996 she "was asked to assist her manager [Mitchell] in going to the restroom by holding his genitals for him." *Id.*

4. In 1996 Mitchell "forced [her] to listen to sexist remarks about a female coworker, including comments that this co-worker's 'legs flew open' at the sight of a photograph of her abusive husband." *Id.*

5. Vickers "was shocked when her supervisor [Mitchell] tricked her into picking up a troll-like doll designed so that a large penis fell from under the shirt when she picked it up" in 1995. *Id.*

6. In 1996 she "was singled out for rude, condescending and often accusatory comments from [Bedwell] who showed no

respect for women or blacks, unless they were in a higher graded position than he." *Id.*

7. In 1998 Bedwell "repeatedly subjected her to intrusive and embarrassing inquiries about personal and medical privacy for no reason other than curiosity, including inquiries of other female employees regarding her medical condition." *Id.* After objecting to these inquiries, she was accused of being "hypersensitive." *Id.*

8. She "was subjected to unjustly reduced performance rating[s], most recently on her October 2000 performance evaluation. When she objected to the ratings given her, and therefore refused to sign the Performance Plan, she was subjected to angry threats from [Bedwell]." *Id.* at *10.

9. In 1999 Vickers "was subjected to sexist comments in the work place, including a statement by her supervisor to the Atlanta Regional Agent staff, which at this point was about 12 (twelve) white men and Ms. Vickers to the effect, 'hey, we're all men here.'" *Id.*

10. She "was subjected to constant derogatory comments made towards women and minorities," including a comment in October 2000 by an instructor employed by the Federal Law Enforcement Training Center "that a baton is a good weapon to use, but depending on the circumstances a gun is a better weapon because it eliminates problems, 'like the Rodney King case.'" *Id.*

11. In 1998 Vickers "was subjected to racial profiling jokes including a comment that a white male could enter their building unchallenged because 'he didn't fit the profile.'" *Id.*

12. In 1998 she overheard insulting remarks from behind a

closed door regarding "affirmative action when an African-American was selected for a position and her white coworkers suggested that he had been selected only because of his race." *Id.*

13. Vickers "was singled out for a requirement to provide inordinate amounts of medical information to support requests for leave." *Id.*

Federal regulations bar discrimination claims that an employee does not first bring to the attention of an agency's EEO counselor within forty-five days of the alleged conduct. *See* 29 C.F.R. §§1614.105(a), 1614.107; *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). Vickers did not contact an EEO counselor until November 9, 2000, which, as the FDIC argues, would appear to bar from her claim any incidents before September 25, 2000. But because "[h]ostile environment claims are different in kind from discrete acts," the Supreme Court has noted that incidents constituting a claim "occur[] over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Because these acts may not all occur within the filing period, the Supreme Court has held "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117. In other words, because of the unique nature of a hostile environment claim, so long as at least one of the acts that contributed to the hostile environment occurs within the filing period, other acts that also contributed to the claim but that did not occur within the filing period may also be considered.

The key inquiries then, for purposes of determining which acts are time-barred and which are not, are "whether the

acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory [filing] time period." *Id.* at 120. We need not consider an alleged incident if it "had no relation to the [other] acts, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim." *Id.* at 118. In *Morgan*, the Supreme Court gave us guidance in making this determination by approving the lower court's method of asking whether the conduct alleged "involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id.* at 120 (internal quotation marks and citation omitted).

The district court, relying on *Morgan* and its progeny, determined that alleged incidents 1-6[4] were not part of the hostile work environment claim that was created by Bedwell, the focus of Vickers' claims, because each involved Mike Mitchell, Bedwell's predecessor and Vickers' supervisor until 1996. *Vickers*, 2005 WL 3207775, at *33. The district court distinguished Mitchell's actions from Bedwell's by finding that Mitchell was "alleged to have acted coarsely and to have made statements with sexual conduct" while "the incidents attributed to Mr. Bedwell involve the exchange of harsh words between [Vickers] and Bedwell in the context of his exercise of normal supervisory functions over [Vickers], such as administering performance appraisals, inquiring into an employee's use of sick leave, and inquiring into time management of his subordinates." *Id.* (citation omitted).

---

[4] The district court incorrectly attributed incident 6 to Mitchell, but the FDIC noted in its brief that it involved Bedwell. Appellee's Br. at 39.

We disagree that the Mitchell allegations were so different in kind that, as a matter of law, we can conclude that they were not part of the same hostile work environment. The line between Mitchell creating a hostile environment through sexual conduct and his deputy-turned successor Bedwell perpetuating the environment by condoning the same is not so well-defined to say that the Mitchell and Bedwell acts have "no relation" as required in *Morgan*. *Morgan*, 536 U.S. at 118. On summary judgment, we consider not just Vickers' allegations but also other supporting evidence such as her response to interrogatories, *see* Plaintiff's Answers to Defendant's First Set of Interrogatories, *Vickers v. Powell*, Civ. No. 03-174 (D.D.C. Nov. 15, 2004), which more fully describe the incidents on which her claim is grounded. According Vickers the benefit of all reasonable inferences, to which she is entitled as the non-moving party on summary judgment, the Mitchell and Bedwell incidents do not seem so obviously different in kind for us to conclude that they are not related as a matter of law.

The Mitchell incidents can therefore be severed from the Bedwell incidents only if we accord conclusive significance to the change in management. But routine personnel actions such as Mitchell's retirement and Bedwell's promotion cannot be the type of "intervening action[s] by the employer" that would sever the earlier incidents from the more recent incidents constituting Vickers' hostile environment claim. *Id.* Although we can easily imagine circumstances in which a change in managers might affect a hostile work environment claim, we see nothing in the record that shows that Bedwell's succession was in any way intended to address the environment created by Mitchell's alleged improprieties. To the contrary, Vickers has alleged that her harassment intensified after the change in management. *Cf. Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007) (faulting district court for focusing on identity of two harassers when both were employed by the defendant company

because "the entity responsible for complying with Title VII is the employer, of which [the plaintiff] had just one"). We thus conclude that the district court erred when it held that Mitchell's actions, as a matter of law, could not reasonably be considered part of the same hostile work environment allegedly created by Bedwell's actions.

The district court also erred in determining which of the Bedwell allegations could be considered to support Vickers' hostile work environment claim. In determining whether any of Vickers' remaining allegations were time-barred after it excluded the Mitchell allegations, the district court first examined the three acts that took place within the filing period, incidents 8, 10, and 13, to determine whether, taken as a group, they could support a hostile work environment claim. Concluding that they were by themselves "insufficient to support a hostile work environment claim," the district court then held that the incidents outside the filing period "cannot be revived under *Morgan* for reconsideration," even if they could make out a hostile work environment claim. *Vickers*, 2005 WL 3207775, at *35.

We disagree with the district court's analysis that the three alleged incidents that took place within the filing period must, by themselves, make out a claim for a hostile workplace before we can make the common sense observation that they were part of a hostile work environment that includes earlier acts. As we have already observed, the Supreme Court addressed this issue in *Morgan*, *see* 536 U.S. at 120, and we have previously held that "the timeliness of [plaintiff's] hostile work environment claim does not depend on whether the acts that he alleged were discriminatory are actionable standing alone." *Singletary v. District of Columbia*, 351 F.3d 519, 527 (D.C. Cir. 2003). "Rather, all [the plaintiff] need demonstrate is that 'the acts about which [he] complains are part of the same

actionable hostile work environment practice.'" *Id.* (quoting *Morgan*, 536 U.S. at 120); *see also Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 140 (4th Cir. 2007) (noting that *Morgan* overturned Fourth Circuit precedent requiring incident occurring within filing period to itself constitute a Title VII violation before looking outside the filing period). Although in Vickers' case, the district court was correct that the three incidents within the period were "insufficient to support a hostile work environment claim," *Vickers*, 2005 WL 3207775, at *35, the Supreme Court has only required that they *contribute* to the claim, not that they *constitute* the claim, *see Morgan*, 536 U.S. at 117.

Consistent with our precedent, we therefore remand this issue to the district court to consider in the first instance whether the allegations concerning Mitchell *and* Bedwell could constitute a hostile work environment that would survive the FDIC's motion for summary judgment. *See Singletary*, 351 F.3d at 528-29 (remanding case to district court for a "determination of both the timeliness and the merits" of plaintiff's claims after determining that district court failed to apply the appropriate limitations analysis under *Morgan*).

## III.

For the foregoing reasons, we remand the MSPB appeal to the district court with instructions to remand the case to the Merit Systems Protection Board. We affirm the decision of the district court granting summary judgment for the government on Vickers' retaliation and discrimination claims. We reverse the district court's judgment on the hostile work environment claim and remand for further proceedings consistent with this opinion.

*So ordered.*