TATEL, Circuit Judge,
concurring:
I write separately to explain my reasons for joining our affirmance of the district court’s grant of summary judgment to the Palestinian Authority as to the Parsons family’s conspiracy claim. I also explain why I would decide neither the scienter *133 issue my colleagues debate, compare Opinion of Judge Henderson (“Henderson Op.”), with Opinion of Judge Brown at 139-43 (“Brown Op.”), nor the vicarious liability issue that Judge Brown reaches, see Brown Op. at 147-52.
I.
Although the parties appear to disagree about the exact elements of an Anti-Terrorism Act civil conspiracy claim, they agree, as do I, that the Parsons family must prove at least the existence of an agreement between Palestinian Authority employees and whoever planted the bomb. Compare In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93, 114 (2d Cir.2008) (listing among section 2332(b)’s requirements that a defendant “agree[ ] to the essence of [the conspiracy’s] objectives” (emphasis added)), with United States v. Hemphill, 514 F.3d 1350, 1362 (D.C.Cir.2008) (“To prove a conspiracy charge, the [evidence] must show that the defendant agreed to engage in criminal activity .... ” (emphasis added)). The family offers two evidentiary theories in support of its argument that a reasonable juror could find such an agreement.
Before addressing those theories, however, I briefly consider the family’s argument that we should take account of two pieces of evidence the district court disregarded. First, the district court ruled inadmissible a document from the website archive of the Israeli Intelligence and Terrorism Information Center purporting to summarize a “captured” Palestinian Authority document allegedly describing plans to create a nitric acid factory to support bomb production. According to the district court, this document is inadmissible because “[i]ntelligenee reports that contain multiple levels of hearsay are not admissible evidence.” Estate of Parsons v. Palestinian Auth., 715 F.Supp.2d 27, 34 (D.D.C.2010). Given that the document only summarizes the supposedly captured Palestinian Authority document and neither quotes that document nor attaches a copy of it, I see no abuse of discretion in the district court’s decision. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (explaining that “[o]n a motion for summary judgment ... the question of admissibility of expert testimony ... is reviewable under the abuse-of-discretion standard”). Accordingly, I too shall disregard the document.
The family also relies on a video snippet of a 2007 interview purportedly with Muhammad Dahlan, head of the Palestinian Preventive Security Services from 1999 until 2002 and Palestinian Minister of State Security from April until September 2003, in which Dahlan said (according to a translation on the Palestinian Media Watch website): “Forty percent of the Martyrs in this Intifada belonged to the Palestinian security forces. The Palestinian security forces were those who protected and hid half of the Hamas [military] leadership and of the Hamas military force during the Intifada.” Palestinian Media Watch, http://www.palwatch.org/main. aspx?fi=713&flcLid=713&doc_id=864 (last visited July 22, 2011). The Palestinian Authority describes this video as “unauthenticated,” suggesting that the video would be inadmissible at trial. Appellees’ Br. 34. But to defeat summary judgment, a party need only produce evidence “capable of being converted into admissible evidence,” Greer v. Paulson, 505 F.3d 1306, 1315 (D.C.Cir.2007) (internal quotation marks omitted), and the defect the Authority identifies seems hardly irremediable. Accordingly, and because the Authority offers no other inadmissibility argument in this court, I shall consider the Dahlan video.
*134 I turn, then, to the family’s two principal arguments for preserving their conspiracy claim, both of which rely almost exclusively on the undated and anonymous two-page memo discovered in the Palestinian Authority’s investigative file. Pointing to a single sentence in that memo, the family first says they can prove that personnel at the checkpoint or Palestinian Authority officials in the convoy’s lead car tipped off the terrorist about the convoy’s movements. That sentence states: “[A]fter information of the arrival of U.S. embassy staff was leaked, either by the National Security personnel at the checkpoint or by those who were accompanying the convoy, the person responsible for the explosion detonated the device.” Because this sentence “is stated as a fact,” not as an inference or a guess, the family argues that it must be believed. Appellants’ Reply Br. 6 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), for the proposition that “the evidence of the non-movant is to be believed”). Moreover, the family contends that as the non-moving party they are entitled to a series of supportive inferences: that the memo was written by a qualified and high-ranking Palestinian Authority investigator, that it was prepared at the conclusion of the investigation, and that it was based on damning facts uncovered during that investigation.
Notwithstanding the family’s valiant effort to build an entire case out of this single sentence, I think it too slender a reed to support the weight of the conspiracy claim. Applying Liberty Lobby, I focus on both the “quantity” and the “caliber” of the family’s evidence. 477 U.S. at 254, 106 S.Ct. 2505. Other than the single sentence from the memo, the only even potentially admissible evidence on which the family relies is (1) the entirely speculative suggestion that because Palestinian Authority officials were in the convoy and at the checkpoint they would have had the requisite opportunity to leak; and (2) the equally speculative suggestion that because the former head of the Palestinian Security forces bragged that some among the many thousands of Palestinian Security forces participated in the Second Intifada, those particular forces at this particular checkpoint must have as well. As for the sentence from the memo, it too is of extremely poor “caliber.” Id. In particular, the sentence refers to no specific facts on which the memo’s author based his conclusion. By contrast, the sentence about the bomb resembling those used in the past by the Popular Resistance Committees rests on “[t]he lid of the device, the type of detonator, the cable used, the poorly connected batteries, the type of explosive material, [and] the outer casing of the device.” Moreover, the Parsons family can show neither who wrote this memo nor at what stage in the investigation it was written. Accepting their tipster theory, therefore, would require piling inference (about the reliability and knowledgability of the statement’s author) upon inference (about when the statement was written) upon inference (about the statement’s evidentiary basis)— akin more to speculation than to reasonable fact-finding. And “[t]he possibility that a jury might speculate in the plaintiffs favor ... is simply” insufficient to defeat summary judgment. Athridge v. Aetna Cas. & Sur. Co., 604 F.Sd 625, 631 (D.C.Cir.2010) (ellipsis in original) (internal quotation marks omitted). Nor does considering the memo in light of Dahlan’s statement change this analysis, for that statement is cast at such a high level of generality that it makes the family’s theory about what happened in this particular instance only infinitesimally more likely. But see Brown Op. 147-48. Accordingly, the family’s tipster theory cannot save their conspiracy claim.
*135 The Parsons family offers a second theory to support their conspiracy claim, namely, that the checkpoint security forces helped the terrorist while he planted the bomb. Significantly, however, the family never defends their conspiracy claim by arguing, as they do with respect to their material support claim, that Qarmout planted the bomb with the help of those stationed at the checkpoint. Instead, the family advances only the more generic evidentiary theory that someone at sometime planted the bomb with some kind of assistance from those security forces. In support, the family relies principally on the fact that the checkpoint was only 20 meters from the bomb site, which to them means that personnel posted there must have known about the bomb. Seeking to demonstrate the reasonableness of that inference, the family points to another sentence in the memo which, employing identical reasoning, states, “The explosive device was planted 20 meters away from the National Security checkpoint, a fact that indicates that those present in front of the checkpoint that day have previous knowledge of the presence of the device.” But apparently recognizing that simply knowing about a bomb or even failing to stop a bomb from being planted does not make one a co-conspirator in a terrorist attack, the family would have a jury further infer that the security forces affirmatively helped place the bomb, perhaps by complying with a request to look the other way. Defending that second inferential leap, the family relies on Qarmout’s statements, but only for the limited proposition “that anyone that planted the bomb on [Salahadeen] Street ... must have obtained the cooperation of the [Palestinian Authority] security checkpoint.” Appellants’ Br. 33. In addition, the family once again suggests that a juror could justifiably infer from Dahlan’s boast that some Palestinian Security forces participated in some attacks during the Second Intifada that personnel at this checkpoint were complicit in this attack.
This second theory is just as dependent on incredibly little and incredibly low quality evidence — and so just as speculative— as the first. Not only would the family ask a jury to make two quite substantial inferences — that the security forces knew of the bomb and that they affirmatively helped plant it — but, as the Palestinian Authority points out, they would do so based on evidence that leaves a number of important questions unanswered, such as “whether the checkpoint was manned 24-hours a day” and “whether the bomb could have been planted unseen at night.” Appellees’ Br. 44. Such a tower of inferences built atop a gap-filled foundation is too unstable to stand. I thus agree with the district court that the family’s generic theory about the help personnel posted at the checkpoint must have provided in planting the bomb is also inadequate to defeat summary judgment.
Given that the Parsons family has failed to defend their conspiracy claim with any evidentiary theory other than the two just rejected, I would ordinarily end my analysis here. But because we have already explained in the context of the family’s material support claim that a reasonable juror could find that “at a terrorist’s behest” the Palestinian Authority personnel posted at the checkpoint “agreed to and did affirmatively remove the threat that local law enforcement officers would themselves interfere with the terrorist’s efforts to plant a bomb,” Maj. Op. at 125 (emphasis added), one might wonder (as does Judge Brown, see Brown Op. at 139, 143-48) how the family could have failed to show a genuine dispute of material fact as to the existence of an agreement in the context of their conspiracy claim.
*136 Although there is some tension between these two analyses, responsibility for that tension belongs to the Parsons family alone. In the district court, the family defended their conspiracy claim first and foremost on the theory that the Palestinian Authority “through their security personnel conspired with a known member of the PRC [i.e., Qarmout] to commit the terrorist act of planting [the] bomb” that killed Parsons. Parsons’ Mem. in Opp’n to Def.’s Mot. for Summ. J. 16, Mar. 1, 2010, ECF No. 31. The district court, however, found the family’s evidence insufficient to sustain that theory, but held that only material support claims, not conspiracy claims, require identifying who carried out the attack. Apparently prompted by that decision, the Parsons family decided to pursue their Qarmout theory on appeal only as an alternative argument in case we agreed with the district court that proving the bomber’s identity is statutorily required — and thus only for their material support claim. Having made such a choice, the family must accept its consequences. See Doe by Fein v. District of Columbia, 93 F.3d 861, 875 n. 14 (D.C.Cir.1996) (per curiam) (finding forfeited an argument relied on by the district court but not raised on appeal).
According to Judge Brown, however, the family “properly [put Qarmout’s statement] before the court as to the conspiracy claim, not just the material support claim.” Brown Op. at 145. I disagree. The conspiracy section of the family’s brief mentions the Qarmout evidence only in a single sentence, while devoting three full pages to the two-page memo discovered in the Palestinian Authority’s investigative file. Appellant’s Br. 33-36. By contrast, the family spends six pages of the material support section on the Qarmout and Popular Resistance Committee evidence. Id. at 22-24, 26-29. Moreover, in the conspiracy section, the family refers to the Qarmout evidence only in support of “the ... generic evidentiary theory that someone at sometime planted the bomb with some kind of assistance from th[e] security forces,” supra at 135; the family never suggests that this evidence describes the specific conspiracy that is the basis for liability. Given the family’s approach, it is hardly surprising that the Authority never once mentions the Qarmout evidence in responding to the family’s conspiracy claim arguments — not even to incorporate arguments made earlier with respect to the material support claim. Appellees’ Br. 45-50. Indeed, the Authority expressly states its understanding that the evidence on which the family relies to support the conspiracy claim “consists of only the two-page memo.” Id. at 46 (emphasis added). Of course, appellees sometimes miss appellants’ arguments, but when they do we can usually count on appellants to point that out in their reply brief — something the Parsons family never does. So, far from misconstruing the family’s brief — and far from “ignorfing]” any evidence, Brown Op. at 143 —my approach to the family’s conspiracy claim simply abides by the basic “premise of our adversarial system ... that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.” Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983).
Judge Brown insists that “[o]ur forfeiture doctrine applies to legal arguments, not facts.” Brown Op. at 143. Not true. There is no such categorical distinction and Judge Brown has not identified even a single forfeiture case saying otherwise. Brown Op. at 144. To the contrary, our district courts’ Local Civil Rule 7(h) expressly authorizes courts to treat as forfeited evidence — including record evidence — that the parties fail to highlight at *137 summary judgment. D.D.C. Local Civ. R. 7(h)(1) (“[T]he court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion,” which statement “shall include references to the parts of the record relied on to support the statement.”). The existence of a genuine dispute of material fact, therefore, ordinarily turns not on a review of the entire record, but rather on the “facts” and the portions of the record each party specifically highlights. See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 154 (D.C.Cir.1996) (rejecting the argument that “the court could not properly decide summary judgment without considering the entire record to determine the existence of genuine issues of material fact” (internal quotation marks omitted)). Likewise, we routinely refuse to consider evidence relied on for the first time on appeal even if that evidence was in the record before the district court. See, e.g., Potter v. District of Columbia, 558 F.3d 542, 549-51 (D.C.Cir.2009) (applying to record evidence the “well settled” forfeiture principle “that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal” (internal quotation marks omitted)).
We apply forfeiture to unarticulated evidentiary theories not only because “judges are not like pigs, hunting for truffles buried in briefs or the record,” id. at 553 (Williams, J., concurring) (internal quotations marks omitted); accord Brown Op. at 144^15, but also because such a rule ensures fairness to both parties. To deny a summary judgment motion based on an evidentiary theory the nonmoving party never developed would necessarily deprive the moving party of the opportunity to poke holes in that theory. See Gardels v. CIA 637 F.2d 770, 773-74 (D.C.Cir.1980) (explaining that one of the purposes of Local Civil Rule 7(h)’s predecessor was to “direct[ ] ... the opponent ... to the parts of the record” at issue so that the “opponent ... has the opportunity to respond”). This concern for fairness would be ill-served if we regularly decided appeals based on record evidence only passingly mentioned in a footnote, or identified for the first time in a reply brief or at oral argument. But see Brown Op. at 143, 144 (implying we do just that).
Fairness is implicated as well where, as here, the nonmoving party develops an adequate evidentiary theory in defense of one but not another claim — at least where the two claims have different elements. After all, an argument useless for attacking a theory in the context of one claim may be devastating to that same theory in the context of the other claim. It is hardly surprising then that in Vickers v. Powell, we did exactly what I do here — namely, in reviewing a district court’s summary judgment decision, we expressly declined to consider relevant record evidence with respect to one of the nonmovant’s claims because the nonmovant had relied on that evidence only to defend a different claim. 493 F.3d 186, 196 (D.C.Cir.2007) (declining to consider evidence of “various discriminatory acts” to rebut an employer’s allegedly non-discriminatory explanation for firing nonmovant in the context of nonmovant’s retaliation claim even while evaluating that evidence in the context of nonmovant’s hostile work environment claim because nonmovant only advanced that evidence in support of the latter claim).
II.
My colleagues debate whether “the Parsons family has failed to establish the scienter requirement of’ their two claims. Henderson Op. at 127. Compare id. (genu *138 ine dispute of material fact not shown for the scienter element), with Brown Op. at 139-43 (disagreeing). I have no need to reach this issue with respect to the Parsons family’s conspiracy claim because, for the different reasons discussed above, I would affirm the grant of summary judgment as to that claim. I would also decline to address the issue as to the family’s material support claim because in its brief to this court the Palestinian Authority never identifies section 2339A’s state of mind requirement as a problem for the specific theory we now accept, namely, that the personnel posted at the checkpoint agreed to Qarmout’s request not to interfere with his efforts to plant a bomb. See United States v. Reeves, 586 F.3d 20, 26 (D.C.Cir.2009) (arguments not made on appeal are ordinarily forfeited).
According to Judge Henderson, the Authority did raise this argument — indeed, “repeatedly.” Henderson Op. at 131. But two of these “repeated[]” references appear in sections of the Authority’s brief devoted to evidentiary theories other than the Qarmout theory. See Appellees’ Br. 33-34 (PRC theory); id. at 43 (the so-called proximity theory). Nor are Judge Henderson’s two citations to the Authority’s Qarmout-based section any more on point. The first — “[tjhere is no evidence that Qarmout would have targeted a U.S. diplomatic convoy,” Appellee’s Br. 37— deals with whether Qarmout committed this attack, not with the state of mind of the personnel at the checkpoint. The second — “[e]ven if someone in the [Palestinian Authority] had given Qarmout a weapon, there is no evidence that they did so ‘knowing or intending that they are to be used’ in carrying out the killing of a U.S. national or other terrorist act,” Appellees’ Br. 41^2 (quoting 18 U.S.C. § 2339A(a)) — clearly refers only to the theory that the Authority provided Qarmout with weapons, rather than the theory that the personnel posted at the checkpoint agreed to Qarmout’s request not to interfere with his efforts to plant a bomb. Because these references point to evidentiary theories other than the Qarmout theory or to elements of the Qarmout theory other than the state of mind element, they are hardly adequate to put the Parsons family on notice of the specific element of the specific evidentiary theory that Judge Henderson now addresses. Under these circumstances, then, it would be unfair to the Parsons family for us to consider whether the evidence creates a genuine dispute of material fact as to the security forces’ state of mind when allegedly aiding Qarmout.
Moreover, even if the Authority had properly raised the scienter issue, I would exercise our discretion not to reach it. The district court never decided this issue and on appeal the parties address it, at best, in passing, and at worst, not at all, see supra at 123-24. As my colleagues’ debate well demonstrates, the issue is both novel and complex. Under these circumstances, I think it most “prudent to remand the ... issue[ ] to the district court for an initial evaluation.” Int’l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock, 783 F.2d 237, 251 (D.C.Cir.1986) (noting that federal appellate courts have discretion to remand “purely legal” issues unaddressed by the district court and inadequately briefed on appeal).
Judge Brown also addresses the Authority’s contention that it may not be held vicariously liable under the Anti-Terrorism Act for the acts its checkpoint employees allegedly took to aid Qarmout. Brown Op. at 147-52. Again, I have no need to reach this issue as to the family’s conspiracy claim. See supra at 119-25. As for the material support claim, although the Authority raised its vicarious liability theory *139 against that claim at oral argument, it never did so in its brief — an oversight I would not overlook. Recording of Oral Arg. at 15:08-15:25, 16:43-17:55; see also Ark Las Vegas Rest. Corp. v. NLRB, 334 F.3d 99, 108 n. 4 (D.C.Cir.2003) (arguments raised for the first time at oral argument are forfeited). Accordingly, I decline to address the vicarious liability issue.
III.
I agree with Judge Brown about the virtue of our “narrow holding”: “we have at least avoided making bad law.” Brown Op. at 150. As the thoughtful legal analyses of my colleagues reveal, the Anti-Terrorism Act’s civil liability provision raises many difficult and still unresolved questions. What scienter showing does the Act require? What is the scope of vicarious liability? Does the intent requirement apply to every element of the Act? That the parties, in addition to outright forfeiting several arguments, barely, or at best poorly, address these other questions confirms my judgment to cut a narrow path in deciding this appeal.