# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 17, 2007　　　Decided November 2, 2007

No. 06-5155

DOROTHY GREER,
APPELLANT

v.

HENRY M. PAULSON, JR., SECRETARY,
UNITED STATES DEPARTMENT OF TREASURY,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 01cv01398)

---

*Gregory S. Wagner* argued the cause for appellant. With him on the briefs were *Elizabeth B. Sandza* and *Michael F. McBride*.

*Andrea W. McBarnette*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: SENTELLE, ROGERS and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Upon the conclusion of her temporary work assignment at the White House, which lasted for more than one year, appellant Dorothy Greer was scheduled to return to her job at the Internal Revenue Service ("IRS"). Instead she requested one month's annual or sick leave and transfer within the IRS. When she did not return to work after the IRS denied her requests and approved only one week's leave, she was placed on absent without leave status ("AWOL"). That status was adjusted in part after she submitted documentation for several months' sick leave. Still she did not return to work. Following the termination of her employment, Greer filed suit pursuant to Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973. The district court granted summary judgment for the Secretary and this court summarily affirmed in part.[1] We now affirm the grant of summary judgment on the remaining claims. Although we hold that absence from the workplace does not bar a hostile environment claim, Greer's hostile environment claim fails because she did not proffer admissible evidence of an incident that could have shown exhaustion of her administrative remedies. Greer's race discrimination claims fail because she did not exhaust administrative remedies for her termination claim and did not proffer evidence sufficient to rebut the Secretary's legitimate, nondiscriminatory reasons for placing her on AWOL.

**I.**

Greer is an African-American female who began working as an IRS attorney in 1983. Between 1990 and 1994, she made numerous complaints about racially offensive behavior in the

---

[1] *See Greer v. Paulson*, No. 06-5155, at 1 (D.C. Cir. Dec. 6, 2006) .

workplace.[2] According to Greer, her second-line supervisor, Marcus Owens, "reacted in a nonchalant, unconcerned manner" and "told [her] not to be so sensitive." Greer Affidavit ¶ 4 (Sept. 20, 2005). One of her reporting supervisors, Harold Toppall, responded by stating that "people are insensitive . . . and [she had] to learn to look over things like that." Greer Deposition 11 (Nov. 17, 2004). Notwithstanding what she considered to be a culture at the IRS that was hostile to African Americans, an opinion based on racial insults she and her coworkers allegedly experienced, Greer continued to excel, although not to the extent she thought she was entitled. She was promoted in 1989 to become a GS-13 Tax Law Specialist and from 1992 through 1994 her performance appraisals stated that she "Exceeds Fully Successful."

In 1993, Greer filed an Equal Employment Opportunity

---

[2] Greer alleges a number of incidents, including finding on her desk an unsigned memorandum that used the "N" word and invoked religious imagery and affirmative action in stating that African Americans "are causing to [sic] many problems," Greer Dep. 73-74 (Nov. 17, 2004). Other incidents included an IRS official suggesting that she and other African-American employees who were on their way to lunch were going out to steal VCRs; an IRS official stating when Greer was speaking with a colleague that he knew Greer was in the room because he had seen her broom and cleaning cart outside the door; an IRS employee asking if she had sold drugs over the weekend to get the bank deposit money that was sitting on her desk; an IRS employee saying that African-American employees could buy a lot of watermelons with their pay raises; an IRS employee saying that a vast majority of African Americans were on welfare; and her second-line supervisor and other IRS employees referring to her as "Mrs. Martin Luther King" and "Queen B" after she complained about racially offensive remarks in the workplace. *See* Greer Aff. ¶ 4 (Sept. 20, 2005); Greer Aff. 7 (undated); Greer Dep. 6-10, 20-21, 33, 44-57, 74-75, 135 (Nov. 17, 2004).

("EEO") Pre-Complaint alleging that she was being treated unfairly because of complaints she made regarding racially charged comments in the workplace. Specifically, she asserted that Owens had inaccurately entered information in her personnel file regarding an alleged absence that was inconsistent with the treatment of other employees. Her grievance was never resolved, but, she claims, her efforts to improve the work environment earned her a reputation as an "upstart" (Appellant's Br. at 8), because she spoke out on racial issues.

Greer was absent from her office at the IRS for approximately sixteen months between January 1994 and April 1995. Three and one half months of sick leave were followed directly by a temporary work assignment to the White House. Toward the end of the temporary assignment, Greer received a telephone message from Garland Carter that her division had been reorganized and that she would be reporting to him upon her return to the IRS in the Exempt Organizations Branch. Although she had never met Carter, Greer had heard "on the grapevine" (Greer Aff. 4, undated), that Carter had privately made disparaging remarks about her; these allegedly included questioning the leave balance she accumulated during her temporary White House work assignment and suggesting that she acquired her White House assignment as the result of a "special," illicit relationship with a Cabinet member, *see id.* at 3-5. Additionally, Greer learned that she was to share an office with two white men whose attitudes toward African Americans she believed "were very negative." Greer Dep. 19-21 (Nov. 17, 2004).

On May 1, 1995, the date Greer was scheduled to return to the IRS from her White House assignment, she telephoned Carter early in the morning to request use of 160 hours of annual leave, with immediate effect. As Greer explained later,

she and her doctor regarded her office environment at the IRS as "too stressful" because the pervasive racial hostility there was adversely affecting her health. Greer Aff. 9 (undated). Greer believed that her manner of requesting leave followed office policy, that her request would be treated respectfully and that it would be granted — as had been the case for coworkers making similar requests. According to Greer, however, Carter "had a visceral reaction to [her] . . . [,] raised his voice" during their conversation, and then "slammed down the phone." *Id*. at 1. Carter granted Greer one week of leave and instructed her to report for duty on Monday, May 8, 1995 or be placed on AWOL — an unpaid status. Greer did not comply with Carter's instruction, and throughout the interactions described below did not report for duty. She never returned to work at the IRS.

Initially, instead of reporting to work on May 8, Greer requested sick leave. Carter required, consistent with IRS policy, that Greer provide medical documentation to support her leave request. The documentation she submitted from her doctor indicated that she could return to work on September 26, 1995, and recommended that she seek a transfer to a less stressful environment. On May 12, 1995, Greer wrote James McGovern, the Assistant Commissioner of Employee Plans and Exempt Organizations, to request an immediate transfer from Carter's group as well as the Exempt Organizations Branch, due to events during the prior 16 months. These included a call by Carter to verify her performance appraisal while on assignment to the White House and his alleged indiscreet statements in front of coworkers about her work attendance. Greer believed other colleagues had requested transfers without problems in the past, but her request was denied.

On May 10, 1995, Greer sought EEO counseling, alleging that the IRS was hostile to African Americans and detailing specific instances of mistreatment on racial grounds, including

harassment, leave denial and unlawful AWOL designation. Greer filed a formal complaint in August 1995; the IRS eventually dismissed some of her claims as untimely or because she had elected an alternative remedy.  After negotiations, a settlement was reached whereby Greer's absences in the period between May and September 1995 were retroactively designated by Carter as either sick leave or leave without pay ("LWOP"); however, use of annual leave was denied.  Greer's absence after September 1995 continued to be classified as AWOL and a letter dated May 24, 1996 advised her that "due to your accumulation of excessive AWOL . . . an appropriate adverse action is being contemplated."  Letter from Garland A. Carter, Chief, Technical Branch Five, to Dorothy Greer (May 24, 1996).

Meanwhile, in December 1995, Greer had been selected to serve on a federal grand jury, which was scheduled to meet twice weekly for 18 months.  The IRS was to pay her for the days she served.  In January 1996, Greer wrote to advise her IRS supervisors that she had been overpaid for grand jury service during the first pay period.  She suggested that her supervisors had overpaid her on purpose in "a deliberate attempt to induce [her] to commit a fraudulent act."  Letter from Dorothy Greer to McGovern, Owens, and Carter (Jan. 19, 1996).  Several months later, Carter discovered that Greer had also been paid for numerous days when the grand jury had not met.  Greer had not informed him when the grand jury did not meet, explaining that, based on what she was told upon first appearing for grand jury service, she expected the federal district court to inform the IRS about this matter.

On August 13, 1996, the IRS terminated Greer's employment, based on her extended absence without leave since September 26, 1995; her acceptance of unearned pay for grand jury service (from December 1995 through May 1996); and her

failure to follow her supervisor's instruction to furnish monthly reports of her grand jury service. Greer filed an administrative complaint on March 30, 1998. When the IRS failed to act, Greer filed suit against the Secretary of the Treasury on June 26, 2001 pursuant to Title VII, 42 U.S.C. § 2000e-16, and sections 501 and 504 of the Rehabilitation Act, 29 U.S.C. §§ 791, 794, alleging race discrimination (including a hostile work environment), sex discrimination, disability discrimination, and retaliation. The district court granted summary judgment to the Secretary. Greer appealed, and in response to the Secretary's motion for summary affirmance, this court affirmed the grant of summary judgment on Greer's claims of retaliation and gender and disability discrimination. Our review of the grant of summary judgment on the remaining claims continues to be *de novo*, *see Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 849 (D.C. Cir. 2006); *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004), according to Greer as the non-moving party the benefit of all reasonable inferences in her favor, *see Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).

## II.

In granting summary judgment to the Secretary on the hostile work environment claim, the district court refused to consider for purposes of administrative exhaustion Greer's evidence concerning three incidents occurring after January 1994. Under Equal Opportunity Commission regulations, an "aggrieved" employee must consult an agency EEO counselor within 45 days of any "matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1); *see Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). The district court justified its refusal to consider the post-1994 incidents on the basis of Greer's absence from the workplace during the time

of her sick leave and temporary work assignment at the White House.  Greer challenges this reasoning, contending that the pre- and post-1994 incidents are sufficiently linked despite her extended absence from the office, and that the timely administrative exhaustion of post-1994 incidents thus extends to her pre-1994 allegations.  More specifically, Greer contends that her May 10, 1995 EEO counseling session appropriately exhausted her administrative remedies because she complained about management's insistence that she return to the allegedly hostile environment on May 1, 1995, the denial of annual leave in May 1995, and Carter's alleged comment to her union representative that she had obtained the White House assignment as the result of a "special" relationship.  The Secretary offers that these incidents are irrelevant and also that Greer's contact with the workplace was so limited that "she had no basis for claiming a hostile work environment existed during the period that she was away or that any alleged previous hostile work environment had not been 'cured.'" Appellee's Br. at 8 n.4 (quoting Appellant's Br. at 17 n.7).  In the alternative, the Secretary maintains that Carter's supposed "special" relationship comment was supported only by inadmissible hearsay and thus is insufficient to support the denial of a motion for summary judgment.

Greer's hostile work environment claim depends on the contention that the pre- and post-1994 alleged incidents form part of a whole.  "Because [acts of harassment] may not all occur within the filing period, the Supreme Court has held '[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'"  *Vickers v. Powell*, 493 F.3d 186, 198 (D.C. Cir. 2007) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)); *Singletary v. District of Columbia*, 351 F.3d 519, 526-27 (D.C. Cir. 2003) (citing

*Morgan*, 536 U.S. at 115). If the incidents are considered as a whole, then Greer's May 1995 request for EEO counseling may constitute administrative exhaustion for all the incidents she alleges because at least some of them occurred within 45 days of her counseling request. *See* 29 C.F.R. § 1614.105(a)(1). By contrast, if the district court were correct, and her absence from the workplace constituted a *per se* preclusion to linking her pre- and post-1994 claims, then any claim she may have had based on the pre-1994 incidents was not exhausted.

This court has not spoken on whether an employee's absence bars consideration of work-related incidents for purposes of exhausting a hostile work environment claim. But in *Morgan*, the Supreme Court recently reaffirmed that "[t]he phrase 'terms, conditions, or privileges of employment' [of 42 U.S.C. § 2000e-2(a)(1)] evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." 536 U.S. at 116 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations omitted)). Given this context, the Supreme Court explained that it is appropriate to consider any timely incident, even where there is a significant time gap between that incident and prior allegations, "so long as each act is part of the whole." *Id*. at 118. The five courts of appeals that have considered this issue agree that employee absence does not bar consideration of work-related incidents as part of a hostile environment claim.[3] As the Eighth Circuit held in *Jensen v.*

---

[3] *See Holmes v. Utah, Dep't of Workforce Servs.*, 483 F.3d 1057, 1063-65 (10th Cir. 2007); *Richards v. Dep't of the Army*, 2007 WL 579549, at *3 (6th Cir. Feb. 15, 2007) (unpublished *per curiam*); *Bray v. Pharmacia Corp./Pfizer, Inc.*, 231 F. App'x 132, 135 (3d Cir. 2007) (unpublished); *Duncan v. Mgr., Dep't of Safety*, 397 F.3d 1300, 1309-10 (10th Cir. 2005); *Jensen v. Henderson*, 315 F.3d 854, 861-62

*Henderson*, 315 F.3d 854, 861-62 (8th Cir. 2002), a hostile work environment "can be a continuing violation even though the employee is not working" where the employee claims her employer drove her out of the workplace due to harassment and "she has received no indication that the environment of harassment has changed."

We join our sister circuits in rejecting a *per se* rule against considering incidents alleged to have occurred while an employee was physically absent from the workplace. There are various ways in which a hostile environment may extend beyond the physical workplace, and thus contribute to and form part of a hostile environment claim. For example, harassment and hostile incidents may occur by telephone or in person during an employee's communication with her employer while she is not working or away from the office. *See, e.g.*, *Richards v. Dep't of the Army*, 2007 WL 579549, at *3 (6th Cir. Feb. 15, 2007) (unpublished *per curiam*). When an employee claims that her "inability to return to work resulted from the [employer's] ill treatment of her," the Eighth Circuit observed, communications while on leave may form an essential part of a hostile environment claim. *Jensen*, 315 F.3d at 861-62. A *per se* rule barring consideration of incidents during a workplace absence would provide an employer with a perverse incentive to place on leave an employee for whom it had created a hostile environment in order to insulate itself from liability. As the Second Circuit observed, there should be no reward for an employer "who sought to rid [the worksite]" of certain employees on the basis of sex or race, by driving them to take leave, or otherwise escape from the workplace. *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994). Just as an

---

(8th Cir. 2002); *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994); *cf. Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 439-40 (1st Cir. 1997).

employer's positive attempts to cure a hostile environment during an employee's absence may protect the employer from liability, any negative actions the employer takes during the absence should be considered. *See, e.g.*, *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000).

It remains for Greer to demonstrate that the post-1994 incidents for which she claims she has exhausted her administrative remedies are sufficiently linked to the pre-1994 incidents. Although we hold that there is no *per se* rule against considering incidents while an employee is out of the workplace, this does not mean that all incidents are automatically linked. The Supreme Court has instructed that "if [the sole timely act] had no relation to the acts [from the earlier period], or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover." *Morgan*, 536 U.S. at 118; *see also Vickers*, 493 F.3d at 199; *Alfano v. Costello*, 294 F.3d 365, 377-78 (2d Cir. 2002). It is true that the persistence of racial harassment at the time Greer was scheduled to return to the IRS could defeat summary judgment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (citing *Harris*, 510 U.S. at 23). But the court cannot infer such persistence after the passage of time, particularly as the employer has presented evidence of "intervening action," *Morgan*, 536 U.S. at 118.[4] In view of the modifications to her

---

[4]    Because Greer has alleged that incidents contributing to her claim occurred within the relevant time period and because her employer has responded by presenting evidence of "intervening action" that changed the prior work environment, the court has no occasion to address whether the fact of her continued employment alone would have made her claim timely, *i.e.*, the failure-to-remedy

workplace and her absence for 16 months it was Greer's burden as the non-moving party to "go beyond the pleadings" to proffer such evidence and "designate specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting FED. R. CIV. P. 56(e)); D.D.C. R. 56.1 (formerly Local Rule 108(h)); *see also Burke v. Gould*, 286 F.3d 513, 517-18 (D.C. Cir. 2002); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996).

In an attempt to demonstrate continuity between pre- and post-1994 incidents, Greer presented evidence that Carter made comments of a similar character to racial incidents she claims to have encountered at the IRS during the period before January 1994. In her deposition, Greer claims: that Carter told her union representative that she had an illicit relationship with the director of the Office of National Drug Control Policy; that Carter suggested this alleged relationship was responsible for her White House assignment; and that Carter's comments reflected the hostile attitude that African Americans were "amoral" and did not advance on the basis of merit. Greer Dep. 87 (Nov. 17, 2004); *see also* Greer Aff. 9 (undated). To survive summary judgment the non-moving party must "produce evidence . . . capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (citing *Celotex Corp.*, 477 U.S. at 324); FED. R. CIV. P. 56(e). Because Greer's evidence about Carter's statement is "sheer hearsay," it "counts for nothing" on summary judgment. *Gleklen*, 199 F.3d at 1369. Although Greer may have suffered harm by her union representative reporting what Carter supposedly said, evidence of her subjective harm is not the same as evidence of Carter

rationale. To the extent that other courts of appeals may have spoken on this question, we express no opinion.

making a hostile comment and does not raise an inference that her employer took discriminatory action contributing to a hostile work environment.  Greer also could not rely on the testimony of her union representative.  In his affidavit, Greer's union representative stated that he did not recall Carter making the alleged statement, but instead remembered Carter saying that Greer "may have known someone" because he (Carter) did not arrange for her temporary work assignment at the White House.  *See* Pollard Aff. (undated), Appellee's Br. Add.  The union representative's affidavit raises no inference of employer animus or action contributing to a hostile environment.

The only admissible evidence of post-1994 incidents — the denial of leave and the requirement to return to work after her White House assignment — fails to show that these incidents form "part of the same actionable hostile work environment practice" as the alleged pre-1994 incidents.  *See Morgan*, 536 U.S. at 120; *see id.* at 117.  Not only did Greer's new supervisor (Carter) advise her by letter of May 1, 1995 that upon her return to work they could "discuss arrangements for leave and assess the workload impact of [her] leave," but there are also two sets of intervening events — one by Greer's employer, in assigning her to a new supervisor and new branch as part of a reorganization of her entire division, and one by Greer, in refusing to return to work.  The IRS's "intervening action," *Morgan*, 536 U.S. at 118, in reassigning Greer within a newly reorganized workplace is more than a "routine personnel action[]," *Vickers*, 493 F.3d at 199, such as a retirement or a promotion.

In response to the "intervening action" proffered by the IRS, Greer has presented no evidence from which a reasonable jury could infer that her new supervisor was "perpetuating" or "condoning," *id.*, a racially hostile environment allegedly created by a previous supervisor in her former branch.  Absent

such a showing, the May 1995 denial of Greer's leave requests and the requirement that Greer return to work are too "obviously different" from the earlier alleged racial harassment incidents to form "part of the same hostile work environment" claim, *id*. These incidents are not of the same character, for example, as the showing in *Vickers* where an objectionable supervisor retired but "nothing in the record . . . show[ed] that [the] succession was in any way intended to address the [prior] environment" and instead there was evidence "that her harassment intensified after the change in management." *Id*. at 199-200. A facially neutral leave or transfer decision may sometimes form part of a hostile environment claim where an employee can show it contributed to the hostile workplace, *see, e.g.*, *id.* at 198-200, but the ordinary supervisory actions here do not raise an inference that the pre-1994 hostile environment continued during Greer's absence, *see, e.g.*, *Alfano*, 294 F.3d at 377.

Although Greer does aver that she was assigned to an office with two white men who she claims had contributed to the racially hostile environment in the past, she does not assert that any of her supervisors had denied a request to place her in a different office within Carter's group. It is telling that, according to Greer, the Assistant IRS Commissioner (McGovern) had "stated in a recent grievance response" that "Carter was a new Branch Chief; in charge of a new branch; had no prior history with Ms. Greer; needed technical employees; and was willing to establish a working relationship with Ms. Greer on a clean slate." Greer Aff. 10 (undated) (emphasis omitted). Greer thus pointed to no evidence suggesting that her work environment would not have been remedied if she had returned to the workplace and sought redress there from a new supervisor for whom she had not previously worked.

Because Greer has proffered no admissible evidence of a

sufficient link between the pre- and post-1994 incidents, she has failed to raise a genuine issue that she exhausted administrative remedies for this claim and thus summary judgment was appropriately granted to the Secretary.

**III.**

There are two elements to Greer's race discrimination claim: the termination of her employment and the AWOL designation. On neither element has she shown that summary judgment was inappropriately granted.

First, Greer has failed to show that she exhausted the termination claim because she offered no evidence that she had met with an EEO counselor within 45 days of the termination of her employment. *See* 29 C.F.R. § 1614.105(a)(1). Nor has she presented any basis for equitable tolling of the 45-day period.[5] By contrast, the Secretary timely proffered an EEO Counseling Report suggesting that the claimed meeting did not occur. Hence, the Secretary was entitled to summary judgment on this claim. Although Greer attempted to show exhaustion upon moving for reconsideration of the grant of summary judgment, Federal Rule of Civil Procedure 60(b) does not afford her an opportunity to retry her case, *see Smalls v. United States*, 471 F.3d 186, 191 (D.C. Cir. 2006), and she is not in a position to show that the tardy affidavits by herself and a colleague were previously unavailable. Greer's contention that her post-judgment affidavit was sufficient to rebut the Secretary's evidence of her failure to exhaust administrative options is untimely. Moreover, the affidavits do not identify the EEO

---

[5]  *See* 29 C.F.R. § 1614.105(a)(2); *Harris v. Gonzales*, 488 F.3d 442, 444 (D.C. Cir. 2007); *Stewart v. Ashcroft*, 352 F.3d 422, 425 (D.C. Cir. 2003).

counselor by name or provide other specific facts relevant to showing that such a meeting in fact occurred. Even if independent corroborating evidence would have been unnecessary had Greer proffered the affidavits before the grant of summary judgment, it was within the district court's discretion to require this afterwards. Consequently, had Greer appealed the denial of her motion for reconsideration, which she has not, there would be no basis for the court to conclude that summary judgment had been inappropriately granted on the termination claim. *Cf. id.*

Second, Greer failed to meet her burden on the AWOL designation, albeit not for failure to exhaust or the reasons provided by the district court. The district court found that Greer, as a member of a protected class alleging that similarly situated white employees were given preferential treatment regarding leave decisions, has met the first two elements needed for a race discrimination claim. *See Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The district court, however, ruled that Greer failed to state a *prima facie* case because she had not shown that either the AWOL time later adjusted (from May 1 through September 26, 1995) or the time not adjusted (from October 1, 1995 through the termination of Greer's employment on August 13, 1996) was an adverse personnel action. In the district court's view, the conversion of Greer's pre-September 26, 1995 AWOL time to sick leave and LWOP would prevent a reasonable juror from finding this period of time was an adverse action; the non-converted AWOL time could not qualify because a leave denial was not an "objectively tangible harm" and Greer was compensated for the annual leave her employer refused to let her use. The district court's ruling was a legal error because a diminution in pay or benefits can suffice even when the employer later provides back pay.

Greer's employer classified her placement on AWOL as an adverse action, which could be the basis of further sanctions, as occurred here. Also, after the adjustment of her leave in the initial period, she remained on LWOP for a part of that time. Hence, the adjusted as well as the unadjusted AWOL-designated periods (except for the days she served on the grand jury) were "adverse." *See Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999); *see also Czekalski*, 475 F.3d at 365; *Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006). As the Supreme Court recently observed in *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2417-18 (June 22, 2006), a suspension without pay, even where an employer later provided back pay, could be "a serious hardship" to a reasonable employee, and thus "materially adverse." Greer proffered her testimony on the serious hardship she experienced as a result of her AWOL status and a letter regarding personal bankruptcy and two real estate foreclosures of her rental properties in August 1996 and February 2000. Her affidavit lists among her damages for compensation money borrowed for education and therapy for her disabled child. She also avers that the LWOP and AWOL designations remained negative marks on her employment record, adversely affecting her receipt of employment benefits and potentially jeopardizing her future employment opportunities. Because Greer presented evidence raising a genuine issue that she experienced a demonstrable "effect" involving "objectively tangible harm," *Brown*, 199 F.3d at 455, 457, she has met the test for adverse action and thus has stated a *prima facie* claim of race discrimination.

In moving for summary judgment, however, the Secretary presented legitimate non-discriminatory reasons for the AWOL designation. "After the employer offers a non-discriminatory justification for its actions, the *McDonnell Douglas* [411 U.S. 792 (1973)] framework falls away, and [the court] must determine whether a reasonable jury . . . 'could infer

discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff." *Vickers*, 493 F.3d at 195 (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998)). Greer has failed to proffer evidence that would raise a genuine issue regarding the Secretary's legitimate non-discriminatory reasons for the AWOL designation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000); *Czekalski*, 475 F.3d at 366. The IRS gave two reasons for the initial AWOL designation: Greer's skills were needed to handle the office workload in her new assignment and she had failed to discuss her leave request prior to the first day she was due to return from her White House assignment. Greer has presented no evidence to dispute the workload justification or to explain, other than hinting that work was hectic in the White House Executive Office, why she failed to follow IRS procedures for requesting leave time in advance. The IRS offered two additional reasons for refusing to rescind Greer's AWOL designation in May 1996: the fact that Greer was medically cleared to return to work but never did, and the concern that she owed money to the government for grand jury service she did not render, for which annual leave would be used to reimburse the government. Greer's attempts to rebut these defenses also fail.

First, Greer sought to show that the Secretary's claim that she was medically cleared to return to work was false. Her evidence consisted of her doctor's notes and her deposition. The first note from her doctor stated that Greer was under his care from May 9 through July 28, 1995, for "a stress related condition which appears to be in response to difficulties experienced in her work environment." Note by Henry W. Dove, M.D., Arlington Psychiatric Group, P.C. (July 28, 1995).

A second note from her doctor stated that Greer was "cleared for return to duty as of 9-26[-95] preferably in a position removed from current work environment." Note by Henry W. Dove, M.D., Arlington Psychiatric Group, P.C. (Sept. 26, 1995). Although Greer interprets her doctor's notes to include a condition precedent that she be transferred, the notes only recommended that "Greer seek a new work assignment" (July 1995) and stated an opinion that "Greer's best health interest would be served by transfer [to a] work environment with less stress" (Sept. 1995). Thus, Greer has raised no genuine issue regarding her ability to return to work as of September 26, 1995 or presented evidence from which a reasonable juror could infer that her employer could not "reasonably believ[e]" that she was cleared to return. *See Gleklen*, 199 F.3d at 1369; *see also Fischbach v. Dist. of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Second, Greer sought to show that the IRS's concern that she owed money to the government for grand jury service between December 1995 and May 1996 was false. Greer does not contest that she received compensation to which she was not entitled for days she did not serve on the grand jury, but rather avers that she committed no wrongdoing by failing to inform her employer when the grand jury did not meet because she was unaware she needed to do so. *See* Greer Dep. 25-32 (Dec. 9, 2004). This explanation is belied by a letter from the district court that Greer herself submitted to Carter, Owens and McGovern in December 1995. The letter stated that "[i]t is the juror's responsibility to deliver th[e] certificate [sent monthly by the court to the juror's address] to their place of employment for verification of dates of attendance at the Court." Letter from U.S. Dist. Ct. for the Dist. of Columbia (Dec. 8, 1995). Greer does aver that she was unaware the overpayments continued until May 1996 and that when she became aware she wrote a second letter expressing her desire to repay the government and

requesting an accounting. The grand jury overpayment was not resolved until December 1996. The record suggests a regrettable series of apparent miscommunications, particularly in the period between Greer's first and second letters, but there is no evidence from which a reasonable juror could infer that the IRS's citing of Greer's acceptance of overpayment as a reason for the AWOL designation was motivated by racial animus and hence pretextual, particularly in the absence of evidence that the IRS could not "reasonably believe[]" that Greer had accepted government funds for grand jury service she did not render. *See Gleklen*, 199 F.3d at 1369.

Third, Greer sought to show that the failure of her supervisors (Owens and Carter) to follow regular IRS personnel procedures was pretextual. Although an employer's violation of its own procedures can be evidence of pretext, *see, e.g.*, *Jones v. Wash. Metro. Area Transit Auth.*, 205 F.3d 428, 434 (D.C. Cir. 2000), Greer admitted in her deposition that Carter's failure to inform her of promotion opportunities during her White House assignment was not a race-based grievance. *See* Greer Dep. 102 (Nov. 17, 2004). Her testimony that Carter and his secretary submitted attendance records without her knowledge in October 1995 does not raise a genuine issue of whether the IRS failed to follow procedures during her absence from work because she identifies no regulation that they violated. Even if she had, it is doubtful that these incidents would give rise to an inference of racial discrimination sufficient to rebut the Secretary's legitimate reasons for the AWOL designation. *See, e.g.*, *Fischbach*, 86 F.3d at 1183 (citing *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982)); *Alfano*, 294 F.3d at 377-78. Greer does point to IRS policy in contending that Owens' termination of her employment while an EEO complaint was pending against him violated the requirement of an "impartial" decisionmaker. *See* INTERNAL REVENUE MANUAL § 0752.43(12)(4) (1994). But Greer's

counsel conceded during oral argument that he was "not sure that the record reflects that [Owens was involved in the AWOL designation]." Oral Arg. Tape (Sept. 17, 2007) at 27:23.1.

For these reasons, Greer's assertion that she could not return to work due to "a blatantly hostile environment" (Appellant's Br. at 11), cannot prevent the grant of summary judgment on the AWOL designation. Absent evidence to rebut her employer's legitimate non-discriminatory reasons for the designation, the evidence of race-based incidents prior to 1994 is insufficient to demonstrate that summary judgment was inappropriately granted. *See, e.g.*, *Czekalski,* 475 F.3d at 366-68 (citing *Aka*, 156 F.3d at 1288-89); *Barbour v. Merrill*, 48 F.3d 1270, 1277 (D.C. Cir. 1995). Even assuming Greer's *pro se* complaint alleged a form of constructive discharge through involuntary leave, she has proffered no evidence of the requisite "aggravating factors," *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (citing *Clark v. Marsh*, 665 F.2d 1168, 1174 (D.C. Cir. 1981)), and failed to exhaust her hostile work environment claim. Consequently, Greer has failed to raise a genuine issue of a "graver claim," *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004) (emphasis omitted), that racial discrimination made "working conditions so intolerable that a reasonable person would have felt compelled to resign," *id*. at 147, or as here, to go on unauthorized leave rather than return to work and seek redress there.

Accordingly, we affirm the grant of summary judgment.