[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14286
Non-Argument Calendar

_____

D.C. Docket No. 2:18-cv-00098-SPC-MRM

WILNER JEAN-PIERRE,

Plaintiff-Appellant,

versus

NAPLES COMMUNITY
HOSPITAL, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 12, 2020)

Before MARTIN, JORDAN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Wilner Jean-Pierre appeals the district court's grant of summary judgment in favor of his former employer, Naples Community Hospital, Inc., on his claims for failure to accommodate his religious practice, discrimination, and retaliation under Title VII, 42 U.S.C. §§ 2000e *et seq.*, and the Florida Civil Rights Act, Fla. Stat. §§ 760.01 *et seq.* After careful review of the parties' briefs and the record, we affirm.

## I

Mr. Jean-Pierre began working for NCH as a clinical technician in January of 2007. He was hired for a full-time position in the 4-South Oncology Department, which generally required working every other weekend. As a member of the Seventh-day Adventist church, Mr. Jean-Pierre's religious beliefs prohibit him from working on his Sabbath—from sundown Friday until sundown Saturday. Before his employment began, he requested a religious accommodation so that he would not have to work on Saturdays. NCH was able to accommodate his request for the entire time period that he worked in 4-South, from around January of 2007 until December of 2010.

On November 11, 2010, Mr. Jean-Pierre applied to transfer to the Outpatient Infusion Services Department. NCH granted his transfer request effective December 12, 2010, and sent him an offer letter stating, in pertinent part, that he was expected to work every other weekend.

OPIS provides infusions for a variety of patients, including patients with infections who need antibiotics and patients who have cancer and need chemotherapy.  It is a much smaller department than 4-South, and only had four CTs—including Mr. Jean-Pierre—between its two campuses.  CTs working in OPIS have different duties and responsibilities than in-patient CTs, because there is much higher patient flow and turnover than in other departments.  OPIS CTs are trained to acclimate to these differences. Accordingly, OPIS is a "closed unit" for all employees—meaning that it staffs itself and generally does not float employees into or out of the department.[1]

NCH preferred to have two CTs working in OPIS on Saturdays because it was the busiest day of the week for the department.  Even so, NCH was able to continue accommodating Mr. Jean-Pierre's request to take Saturdays off for almost two years after he transferred to OPIS.

In October of 2012, however, NCH became unable to accommodate Mr. Jean-Pierre's request after two CTs in OPIS resigned.  One CT resigned in April of 2012 and another CT submitted a resignation letter on October 5, 2012, effective a week later.  This left OPIS with only two CTs—Mr. Jean-Pierre and Vanie Cineus.

---

[1] Mr. Jean-Pierre disputes that employees could not float in and out of OPIS.  NCH submitted the deposition testimony of its Chief Human Resources Officer, Renee Thigpen, explaining that OPIS is a "closed unit," meaning that it "staffs itself" and that it does not "float" employees in from or out to other departments.  Mr. Jean-Pierre presented evidence that on occasion someone from another department would assist in OPIS, but that this was not done on a routine basis.

3

On October 8, Dora Krauss—who supervised OPIS at the time—spoke to Mr. Jean-Pierre about the staffing situation. She explained that NCH could no longer give him every Saturday off and that he would need to work every other weekend, starting on Saturday, October 20. Ms. Krauss also instructed Mr. Jean-Pierre to try to switch shifts with another CT and referred him to the Staffing Office to see if it could assist. After this conversation, Mr. Jean-Pierre provided Ms. Krauss with a letter from his pastor outlining his religious convictions, but she informed him that he still needed to report to work that Saturday.

Mr. Jean-Pierre did not come to work on Saturday, October 20, and consequently, was issued a three-point "reminder" under NCH's corrective action policy. Under this policy, "[a]n accumulation of 12 points during a rolling 12 month period (looking backward) may result in termination of employment . . ." Mr. Jean-Pierre had already been issued four points under the policy in August of 2012 for other reasons.

On November 2, Human Resources Director Michelle Zech met with Mr. Jean-Pierre. During this meeting, Ms. Zech suggested that he (1) transfer to a *per diem* position; (2) transfer to a full-time position in another department with different hours or more employees who may be able to switch shifts with him; or (3) swap his upcoming Saturday shift on November 3 with another CT.

4

Ms. Zech also sat with Mr. Jean-Pierre at a computer and helped him look up available jobs, and gave him her business card and information about how to apply for open positions from home. There was a nighttime position available, but Mr. Jean-Pierre said he was not able to work nights. NCH also had *per diem* positions available. "Per diem" employees work on an as-needed basis: the employees choose the days they are willing to work and provide their availability to the department, which then calls them when there is a need that matches their stated availability.

Ms. Zech testified at her deposition that she did not help Mr. Jean-Pierre apply for any particular position during their meeting because "he did not see one that he wanted to apply for at that time[.]" D.E. 48-38 at 44. Had he been interested in another position, Ms. Zech said that she "would have sat there and helped him," and that her "goal was to help him find a job that would meet his schedule that day." *Id.* Renee Thigpen, the Chief Human Resources Officer for NCH, stated in her declaration that NCH "was committed and willing to assist [Mr. Jean-Pierre] in finding another position, and the Hospital would have 'fast tracked' any transfer request had [he] expressed any interest or made any application." D.E. 42-23 ¶ 3.

On Saturday, November 3, Mr. Jean-Pierre again did not show up for his scheduled shift. Because this was a repeat violation, he was issued a five-point "reminder" under the corrective action policy, bringing his total corrective action points to 12. On November 7, NCH terminated Mr. Jean-Pierre's employment under

5

the corrective action policy, because he had accumulated 12 points in a 12-month period.

## II

On April 5, 2013, Mr. Jean-Pierre filed a charge with the EEOC alleging religious discrimination.  In November of 2017, the EEOC issued a Notice of Right to Sue.   Mr. Jean-Pierre subsequently sued NCH for intentional religious discrimination, failure to accommodate his religious beliefs, and retaliation under Title VII and the Florida Civil Rights Act.[2]

NCH moved for summary judgment, arguing that it offered Mr. Jean-Pierre reasonable accommodations and that permitting him to take Saturdays off would impose undue hardship.  NCH also argued that Mr. Jean-Pierre could not make out a *prima facie* case of religious discrimination, that he did not exhaust administrative remedies for his retaliation claim, and that he could not establish causation or pretext.

The district court granted NCH's motion.  In doing so, it limited its analysis to the accommodation claim because all three claims centered on NCH's alleged

---

[2] "Because the FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework," Mr. Jean-Pierre's state law claim does "not need separate discussion and [its] outcome is the same as the federal ones."  *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010).

failure to accommodate Mr. Jean-Pierre's religious observance. The district court concluded that NCH offered Mr. Jean-Pierre reasonable accommodations, including allowing him to swap shifts or transfer positions. It also concluded that continuing to permit Mr. Jean-Pierre to take Saturdays off would impose undue hardship on NCH, given that OPIS staff had to work weekend shifts to provide for its patients' needs.

This appeal followed.

### III

We review the district court's grant of summary judgment *de novo,* viewing the evidence in the light most favorable to Mr. Jean-Pierre and drawing all inferences in his favor. *See Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1283 (11th Cir. 2012). "Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

### IV

We first address Mr. Jean-Pierre's religious accommodation claim, and then turn to his discrimination and retaliation claims.

### A

In a case involving circumstantial evidence, "[a] Title VII plaintiff must first establish a *prima facie* case of religious discrimination by 'present[ing] evidence

sufficient to prove that (1) he had a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of his belief; and (3) he was discharged for failing to comply with the conflicting employment requirement.'" *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 505 F.3d 1317, 1321 (11th Cir. 2007) (citations omitted).  If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to 'demonstrate[ ] that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business.'"  *Id.* (quoting 42 U.S.C. § 2000e(j)).

Because the parties do not dispute that Mr. Jean-Pierre established a prima facie case, we begin by reviewing whether NCH provided Mr. Jean-Pierre a reasonable accommodation.  "[A] reasonable accommodation is one that 'eliminates the conflict between employment requirements and religious practices.'"  *Id.* at 1322 (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986)).  An employer is not required, however, "to choose any particular reasonable accommodation.  By its very terms the statute directs that *any* reasonable accommodation by the employer is sufficient to meet its accommodation obligation."  *Philbrook*, 479 U.S. at 68 (emphasis added).

8

NCH argues that it offered Mr. Jean-Pierre two reasonable accommodations. One was permitting him to swap shifts with other employees, and the other was encouraging him to transfer to another position.

Mr. Jean-Pierre contends that switching shifts was not a realistic option because there was only one other CT working in OPIS at the time: Ms. Cineus. Even if Ms. Cineus agreed to swap shifts, it would have resulted in her working overtime, which was not allowed by NCH. Mr. Jean-Pierre also argues that he could not swap shifts with CTs from other departments because of OPIS' specialized nature. The record supports Mr. Jean-Pierre's contentions. But even if swapping shifts was not feasible in this case, NCH provided a reasonable accommodation by offering to assist Mr. Jean-Pierre with applying for other positions at NCH.

Mr. Jean-Pierre argues that applying for a transfer was not a reasonable accommodation either, as there was no guarantee that he would have been selected for another position. He further asserts that he could not have secured a new position before his upcoming Saturday shift—which was the day after his meeting with Ms. Zech.

We are persuaded that offering to help Mr. Jean-Pierre apply for a new position is a reasonable accommodation based on our opinion in *Walden*. In *Walden*, after the plaintiff was laid off, her employer provided her with resources to help her find another job within the company. *See* 669 F.3d at 1282. Because she was laid

9

off rather than terminated for cause, she would be permitted to retain her tenure with the company if she found a new position within one year. *See id.* We held that "encourag[ing] her to obtain new employment with the company and offer[ing] her assistance in obtaining a new position" was a reasonable accommodation, even though there was no guarantee that she would secure a new position. *See id.* at 1294.

Though we recognize that Ms. Zech could have met with Mr. Jean-Pierre sooner, in *Walden* the employee was not offered assistance until *after* she was laid off. *See id.* at 1282. Moreover, Ms. Thigpen stated in her declaration that had Mr. Jean-Pierre expressed interest in another available position, NCH "would have considered that fact when reviewing whether termination was appropriate, and more likely than not, decided to forego termination at that time since [he] was taking affirmative action to address the scheduling conflict." D.E. 43-23 ¶ 4. We also note that Mr. Jean-Pierre was aware of the option to transfer departments earlier, as he had applied to transfer from 4-South to OPIS in 2010. He also knew that working in a larger department was more likely to make his request feasible, as NCH had permitted him to take Saturdays off when he worked in 4-South.

It is undisputed that Mr. Jean-Pierre did not apply for another position, even though there were *per diem* positions available which would have accommodated his schedule. "While we recognize an employer's duty to reasonably accommodate the religious practices of its employee, we likewise recognize an employee's duty to

10

make a good faith attempt to accommodate his religious needs through the means offered by the employer." *Beadle v. Hillsborough Cty. Sheriff's Dep't*, 29 F.3d 589, 593 (11th Cir. 1994). Mr. Jean-Pierre "failed to comply with this duty when [he] elected not to apply for any positions[.]" *Walden*, 669 F.3d at 1294.[3]

Because NCH demonstrated that it reasonably accommodated Mr. Jean-Pierre's needs, we need not address whether an accommodation would impose an undue hardship. *See Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995). We nevertheless note that OPIS provides infusions for patients who need antibiotics or chemotherapy. Where, as here, "the employer's business involves the protection of lives," we are reluctant to "restructur[e] [its] employment practices." *Id.* at 637. NCH also was not required to force Ms. Cineus to work every Saturday in contravention of the terms of her employment to accommodate Mr. Jean-Pierre. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81 (1977) (stating that Title VII does not require an employer to "deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others"). We therefore affirm the

---

[3] *Per diem* positions are a reasonable accommodation even if they did not include benefits. *See Morrissette-Brown*, 506 F.3d at 1324 n.6 (noting that the employer's offer of a "flex" certified nursing assistant position was a reasonable accommodation even though the position "did not include benefits or health insurance," because a "proposed 'reasonable accommodation' may involve some cost to the employee"). The record reflects that NCH was in need of *per diem* CTs, so Mr. Jean-Pierre "would have easily been able to work 40 hours per week as a *per diem* had he chosen to do so."

district court's grant of summary judgment on Mr. Jean-Pierre's religious accommodation claim.[4]

**B**

Mr. Jean-Pierre next argues that the district court erred in granting summary judgment in favor of NCH on his discrimination and retaliation claims.

**1**

The district court correctly concluded that Mr. Jean-Pierre's discrimination claim is duplicative of his accommodation claim, and therefore it does not require separate analysis. In his amended complaint, Mr. Jean-Pierre alleged that NCH "intentionally discriminated against [him] by terminating him because of his religion, including his sincerely held religious belief prohibiting him from working Friday evening to sundown Saturday because it was his Sabbath." D.E. 23 ¶ 30. He did not allege a factual basis for this claim other than NCH's purported failure to accommodate, which we have already analyzed. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 n.2 (2015) (explaining that discriminating against

---

[4] We reached the same conclusion in an unpublished decision with similar facts, *Patterson v. Walgreen Co.*, 727 F. App'x 581 (11th Cir. 2018). In *Patterson*, after the plaintiff employee failed to show up for work on a Saturday because it was his Sabbath, a human resources representative met with him about looking for another position at the company that would better accommodate his schedule. *See id.* at 584. He was terminated a couple of days later, after declining to look for another position. *See id.* We affirmed summary judgment in favor of the employer, explaining that the employer provided reasonable accommodations by allowing him to swap shifts and encouraging him to seek a different position within the company. *See id.* at 587.

an employee or applicant based on her religious practice "is *synonymous* with refusing to accommodate the religious practice").

Although Mr. Jean-Pierre correctly asserts that a plaintiff may plead two separate claims for discrimination—one based on the employer's failure to accommodate and another based on other grounds—he has not done so here.  To the extent that Mr. Jean-Pierre raises additional grounds of discrimination on appeal, we do not consider them because they were not alleged in his complaint.  *See Coon v. Ga. Pacific Corp.*, 829 F.2d 1563, 1569–70 (11th Cir. 1987).

**2**

Although there is some overlap between Mr. Jean-Pierre's retaliation claim and his accommodation claim, we think his retaliation claim warrants separate analysis.  "We may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below."  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

As a preliminary matter, NCH argues that Mr. Jean-Pierre failed to exhaust his administrative remedies for his retaliation claim.  Although he did not mark the box for retaliation in his EEOC charge, he alleged that he was terminated because he was unable to work on Saturdays due to his religious beliefs. Given that we liberally construe the scope of an EEOC complaint, these facts could reasonably be

extended to encompass a claim for retaliation. *See Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (holding that the plaintiff's "retaliation claim was not administratively barred by her failure to mark the retaliation space on the EEOC template form" because "[t]he facts alleged in her EEOC charge could reasonably have been extended to encompass a claim"). We therefore address the merits of the retaliation claim.

To make a prima facie case of retaliation, "the plaintiff must show: (1) that she engaged in statutorily protected conduct; (2) that she suffered adverse employment action; and (3) that there is 'some causal relation' between the two events." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (citation omitted). "Once a plaintiff has established a prima facie case, the employer then has the opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the employer offers legitimate reasons for the employment action, "the plaintiff then bears the burden of proving by a preponderance of the evidence that the reasons offered by the [employer] are pretextual." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

In his retaliation claim, Mr. Jean-Pierre alleged that "following [his] continuing requests for an accommodation for his religious beliefs and filing a charge of discrimination based upon religion, [NCH] took adverse employment

14

actions against him," including terminating him. *See* D.E. 23 ¶ 41. This can be separated into two parts: NCH retaliated against him for filing an EEOC charge, and NCH retaliated against him for requesting an accommodation.

Mr. Jean-Pierre's retaliation claim based on the EEOC charge cannot survive summary judgment, because it is undisputed that he was terminated *before* he submitted the EEOC charge. Thus, filing the EEOC charge could not have been the cause of his termination. *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.").

Nor can Mr. Jean-Pierre withstand summary judgment on his claim that he was retaliated against for requesting an accommodation. Even if Mr. Jean Pierre could make out a prima facie case of retaliation, he failed to raise a genuine issue of material fact that NCH's proffered reason for his termination was pretextual. NCH terminated Mr. Jean-Pierre because he accumulated 12 points under its corrective action policy—the last eight of which were for failing to show up for his scheduled Saturday shifts. Although NCH was not *required* to terminate him under the policy, Mr. Jean-Pierre made clear that he would continue to not show up for Saturday shifts, and as discussed earlier, NCH could no longer accommodate his scheduling request

15

after two other CTs in OPIS resigned.  Mr. Jean-Pierre does not point to any evidence of retaliatory animus.  Instead, the record reflects that NCH terminated him because he was unable to comply with the schedule requirements for CTs in OPIS and unwilling to apply for another position at NCH.[5]

Accordingly, the district court did not err in granting summary judgment in favor of NCH on the retaliation claim.

## V

For the foregoing reasons, we affirm.

**AFFIRMED.**

---

[5] Mr. Jean-Pierre's retaliation claim arises under the part of Title VII that makes it unlawful for an employer to discriminate against an employee "because he has *opposed* any practice made an unlawful employment practice by [Title VII]," known as the "opposition clause."  *See* 42 U.S.C. § 2000e-3(a) (emphasis added).  We have not addressed whether a request for an accommodation constitutes "oppositional" conduct for purposes of a Title VII retaliation claim.  *See EEOC v. N. Memorial Health Care*, 908 F.3d 1098, 1101–03 (8th Cir. 2018) (analyzing whether a request for a religious accommodation constitutes "opposition" for purposes of stating a Title VII retaliation claim).  But NCH does not raise this issue, and we need not address it here because Mr. Jean-Pierre's retaliation claim fails for other reasons, as discussed in the text.

16